UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAO CHOUA VUE,

                Plaintiff,

    v.                                Case No. 22-cv-506-pp

CO O'NEILL and CO BARZYK,

                Defendants.

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40) AND GRANTING DEFENDANTS' MOTION TO RESTRICT DOCUMENT (DKT. NO. 49)**

Plaintiff Pao Choua Vue, an incarcerated person who is representing himself, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against two correctional officers at Waupun Correctional Institution. The defendants move for summary judgment, dkt. no. 40, and move to seal a document filed in support of their motion for summary judgment, dkt. no. 49. The plaintiff opposes the defendants' motion for summary judgment. Dkt. No. 57. The court finds that a trial is necessary to decide the plaintiff's claims and will deny the motion for summary judgment. The court will grant the motion to restrict the document identified by the defendants.

I.    **Facts**

    A.    <u>Procedural Background</u>

On April 8, 2019, the plaintiff filed his complaint in the U.S. District Court for the Western District of Wisconsin. Dkt. No. 1. On September 10, 2021, District Judge William M. Conley screened the complaint and allowed the

plaintiff to proceed on an Eighth Amendment claim of excessive force against two correctional officers at Waupun. Dkt. No. 20. On April 26, 2022, Judge Conley granted the defendants' motion to transfer the case to the Eastern District of Wisconsin because the defendants reside in this district and because the events that the plaintiff alleged in his complaint occurred at Waupun, which is in this district. Dkt. No. 32. The next day, the case was transferred to this district and assigned to this court. Dkt. No. 33.

On May 10, 2022, the court issued a scheduling order, setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 38. At the November 21, 2022 deadline, the defendants moved for summary judgment and to seal one of the documents they filed in support of that motion. Dkt. Nos. 40, 49. After the court granted the plaintiff two extensions of time to respond to the defendants' motion, dkt. nos. 52, 56, the plaintiff filed his response materials, dkt. no. 57. The defendants' motions are now fully briefed.

B.    Factual Background

The plaintiff was incarcerated at Waupun during the events alleged in the complaint. Dkt. No. 42 at ¶1. Defendants Keith Barzyk and Thomas O'Neill were employed as correctional officers at Waupun during the same time. Id. at ¶¶2–3.

1.    *Prisoner Fights at Institutions*

The defendants explain in declarations filed in support of their motion for summary judgment that fights between incarcerated persons at Department of Corrections (DOC) institutions are "a very serious occurrence" that may result

2

in serious injury or death to the fighting individuals. Id. at ¶¶4–5. They aver that incarcerated persons may use weapons during these fights and may pose a risk to prison staff, including security staff and medical staff who "can get caught in" a fight among incarcerated persons. Id. at ¶¶6–7. Because of those risks, prison staff must try to end fights quickly. Id. at ¶8. The longer a fight continues, the more likely it becomes that other incarcerated persons may join or that staff may be seriously harmed. Id. at ¶12.

Prison staff attempting to end a fight will first tell the incarcerated persons to stop fighting to encourage them to voluntarily end the fight without physical force. Id. at ¶9. If the incarcerated persons do not stop on their own, prison staff must use physical force to stop the fight. Id. at ¶¶10–11.

### 2. *The October 6, 2018 Incident*[1]

On October 6, 2018, Officers Barzyk and O'Neill were in the South Cell Hall at Waupun when they heard someone yell "fight." Id. at ¶13. The officers saw the plaintiff fighting another incarcerated person, though the parties disagree about whether he was using offensive or defensive strikes. Id. at ¶14; Dkt. No. 57 at 12, ¶14. The officers aver that the plaintiff was "using a closed fist striking down on an inmate 'in a downward motion like a hammer.'" Dkt. No. 42 at ¶14 (quoting Dkt. No. 46-1 at 2). O'Neill believed the plaintiff was "punching down on the other inmate," and he became concerned that the

---

[1] Both officers filed incident reports describing their involvement in the October 6, 2018, altercation. Dkt. Nos. 46-1 (Barzyk), 46-2 (O'Neill). The information in those reports closely follows the information the officers provided about the incident in their declarations.

plaintiff "was seriously harming the other inmate." Id. at ¶15. The plaintiff avers that he was not using a closed fist but "was striking down in a swiping motion to block the strikes aimed at his face." Dkt. No. 57 at 5, ¶3 (Plaintiff's Declaration). He insists that he was merely defending himself. Id. at ¶4.

Officer O'Neill was the first officer to respond to the scene. Dkt. No. 42 at ¶17. He believed he needed to quickly end the situation to protect the incarcerated persons and staff. Id. at ¶15. Both officers yelled to the incarcerated persons to stop fighting. Id. at ¶16; Dkt. No. 44 at ¶6. O'Neill says the plaintiff "ignored his directives and continued to strike the inmate." Dkt. No. 42 at ¶16. The plaintiff says he "never ignored any directive by staff or O'Neill;" he says he "was being attacked by inmate [Spencer] Potts and O'Neill was yelling directives inmate Potts ignored." Dkt. No. 57 at 5, ¶5. O'Neill says he considered using pepper spray on the incarcerated persons to get them to stop fighting. Dkt. No. 42 at ¶17. He decided against that because the fight occurred "during a time of movement of inmates," and there were around forty other incarcerated persons nearby that he might also incidentally pepper spray. Id. at ¶¶17–18. O'Neill also avers that a door was open, which could allow wind to blow in and blow back the pepper spray into staff or other incarcerated persons. Id. at ¶19. O'Neill says he "had to make a very quick decision on whether to use OC [oleoresin capsicum] spray" and decided against it based on his belief "that it would potentially cause more damage than good." Id. at ¶20. O'Neill instead decided to physically restrain the plaintiff to end the fight while protecting other incarcerated persons and staff. Id. at ¶21.

4

O'Neill avers that he attempted to stop the fight by "physically grabbing" and "restraining" the plaintiff. Id. at ¶22. Officer Demers (who is not a defendant) secured the incarcerated person with whom the plaintiff was fighting and held him against a wall. Id. at ¶23. O'Neill describes the plaintiff as "a medium sized man" who "was very agitated, so it required a lot of force to attempt to restrain him." Id. at ¶24. He avers that he did not use more force than he believed necessary to restrain the plaintiff. Id. at ¶25. He explains that a member of security staff "must use a lot of force" to "overpower the inmate that he is trying to restrain." Id. at ¶26. O'Neill says that if staff do not use force sufficient to overcome the incarcerated person, that person may harm staff or continue fighting. Id. at ¶27.

The plaintiff counters that O'Neill did not grab him but instead "tackled" him from behind "and struck with such force [that] he was lifted off the floor." Dkt. No. 57 at 5, ¶6. The plaintiff says O'Neill used "unnecessary extreme force" against him and slammed him "head first into a bar style door." Id. at ¶¶6–8. He says O'Neill used a technique "designed to take the wind out of a person, disorientate them, take them off balance and land them in a position with the attacker on top." Id. at ¶9. The plaintiff insists that "[a] 'lot of force' is rarely necessary" to restrain an incarcerated person, and he says other incarcerated persons rarely "'continue' to resist or harm another person." Id. at ¶¶11–12.[2]

---

[2] The plaintiff describes the technique O'Neill used as "a move called 'shooting' in the UFC sport." Dkt. No. 57 at 6, ¶10. The UFC is the Ultimate Fighting Championship, a professional mixed martial arts company.

O'Neill avers that the plaintiff resisted his use of force by pushing his body against a wall and attempting to break free from O'Neill and toward the other incarcerated person to continue fighting. Dkt. No. 42 at ¶28. O'Neill continued to command the plaintiff to stop fighting while he attempted to restrain him. Id. at ¶29. O'Neill avers that he hoped that once the plaintiff realized O'Neill was trying to restrain him, he would stop resisting and end the fight; but the plaintiff instead ignored him and his directives. Id. at ¶30. The plaintiff avers that he did not resist and was never against a wall. Dkt. No. 57 at 6, ¶13. He reiterates that O'Neill tackled and struck him and pushed him up against and between steel bars. Id.

O'Neill eventually was able to overpower the plaintiff and remove him from the fight. Dkt. No. 42 at ¶31. Officer Barzyk then came to help O'Neill restrain the plaintiff. Id. at ¶32. Barzyk avers that he attempted to secure the right side of the plaintiff while also telling him to stop resisting. Id. at ¶33. He says the plaintiff ignored his directives. Id. Although Barzyk says he decided against using his pepper spray earlier in the altercation, he also says he had to "put away [his] peppers [*sic*] spray" before assisting O'Neill in restraining the plaintiff. Dkt. No. 44 at ¶15. The plaintiff contends that Barzyk "aided O'Neill when he landed on the plaintiff while [he was] lodged up against and between steel bars." Dkt. No. 57 at 6, ¶15. He again asserts that he was not resisting and was acting in defense of the other incarcerated person's attacks. Id. at ¶14.

Once the officers had control of the plaintiff, they attempted to stabilize and handcuff him so that he could not reengage in the fight or harm prison

staff. Dkt. No. 42 at ¶34. Barzyk avers that security staff responding to a fight usually place the aggressor on the ground to handcuff him if they cannot do so against a wall. Id. at ¶35. O'Neill avers that putting the plaintiff on the ground was the best way to keep from reengaging in the fight and prevent him from harming staff. Id. at ¶36. He says it was a better option than securing him against a wall because the wall would not provide enough stability to prevent the plaintiff "from trying to break free." Id. The officers told the plaintiff "to 'get down on the ground'" so they could handcuff him. Id. at ¶37. Barzyk avers that the plaintiff continued to resist, so it was difficult to get him to the ground. Id. at ¶38. The officers say they "used their best effort" to move the plaintiff to "the ground as softly as possible." Id. at ¶39. They say they used care and moved slowly "to watch his head" and avoid injuring him. Id. at ¶40. The plaintiff disputes the officers' recount of the events and says he "abided by every directive given by staff despite the injuries he sustained to his head by O'Neill and Barzyk." Dkt. No. 57 at 6, ¶16. The plaintiff says the officers "had no resistance when they slammed the seriously injured plaintiff to the floor." Id. at ¶17. He says one of the officers also placed force on his neck "while his face was in a pool of his own blood." Id. at ¶18.

Once the officers secured the plaintiff on the ground, they handcuffed him and assisted him to his feet. Dkt. No. 42 at ¶¶41–42. The officers observed "a small pool of blood on the floor and a laceration on [the plaintiff's] forehead." Id. at ¶42. Barzyk avers that it "was unclear if the blood and lacerations were from [the plaintiff] fighting with the other inmate or a result of the attempts by

7

security staff to control [him]." Id. at ¶43. The officers aver that they did not intend to harm the plaintiff, who did not lose consciousness during the incident. Id. at ¶¶44–45. The plaintiff says the officers did not "assist" him to his feet but "violently snatched" him off the floor and lifted him. Dkt. No. 57 at 7, ¶19. He says it was "very clear" that his injuries were the result of the officers' use of force; he says his "head was split open from being slammed against and lodged into steel bars." Id. at ¶20. He describes the use of force as "violent and excessive," and he reiterates that he was neither assaulting another incarcerated person nor ignoring the officer's commands. Id. at 21. Although he does not contest the officers' position that he did not lose consciousness, he says he was "very disoriented" from the incident. Id. at ¶22.[3]

The plaintiff avers that O'Neill rammed his "head into a steel bar door when he launched himself into the plaintiff's back, which in turn lodged plaintiff's head into the steel bars." Id. at ¶23. He claims that while he had the plaintiff pinned against the door, O'Neill said to him, "you slant-eyed fucker, we run this prison." Id. at ¶24. The officers counter that they "did not ram [the plaintiff] into a gate door, and they did not lodge [his] head between bars of a door." Dkt. No. 42 at ¶50. They dispute the plaintiff's claim about what O'Neill said to the plaintiff. Id. at ¶51. O'Neill avers that he never said that to the plaintiff, and Barzyk avers that he never heard O'Neill "say anything like that" to the plaintiff. Id.

---

[3] The plaintiff alleged in his complaint that he was "in-and-out of consciousness and gasping for air" during the incident Dkt. No. 1 at ¶11.

### 3. *Aftermath and Medical Treatment*

Barzyk avers that he asked other staff to contact the Health Services Unit immediately so medical staff could evaluate the plaintiff's injury. Id. at ¶46. First responders appeared on the scene and took the plaintiff to the Restricted Housing Unit to provide medical treatment. Id. at ¶47. A nurse examined the plaintiff and noted a laceration on his forehead "approximately 6 cm long," a "small puncture wound" through his upper left lip and bruising on the side of his face. Id. at ¶48; Dkt. No. 45-1 at 6. The plaintiff also reported feeling dizzy. Dkt. No. 45-1 at 6. The plaintiff included pictures of his injuries with his response materials. Dkt. No. 57-1 at 4–5. The first of the pictures shows the large gash above the plaintiff's left eye, which has a stream of blood oozing from the wound. Id. at 4. Blood also appears between the plaintiff's left eyebrow and his left eye, splattered along the upper left portion of his head and smeared from his lower lip. Id. The picture also shows bright red marks and bruises on the plaintiff's left cheekbone, just to the left of his nose and above his left lip. Id. The second picture shows the nurse cleaning the plaintiff's laceration with a bandage or compress. Id. at 5.

The nurse cleaned the plaintiff's wounds and wrapped his head with Coban wrap, and medical staff transferred the plaintiff to a hospital for evaluation and treatment. Dkt. No. 45-1 at 6. The hospital's treating physician noted that the plaintiff was "[a]lert and oriented to person, place, time, and situation." Id. at 3. The physician sutured the plaintiff's forehead laceration. Id.

He reported the plaintiff's degree of bleeding and degree of pain as "minimal." Id. at 2. The plaintiff denied vomiting or feeling nauseous. Id.

### 4. *The Plaintiff's Proposed Facts*

The plaintiff says that on October 6, 2018, he "was attacked by another inmate" and was defending himself. Dkt. No. 57 at 3, ¶17. The plaintiff's verified complaint provides additional information about the incident before the officers became involved. Because the plaintiff's complaint is verified, the court will treat it "as evidence for purposes of summary judgment." See Jones v. Van Lanen, 27 F.4th 1280, 1285 (7th Cir. 2022) (citing Ford v. Wilson, 90 F.3d 245, 246–47 (7th Cir. 1996)). The complaint asserts that on October 6, 2018, the plaintiff was heading toward the sergeant's station to request tissues. Dkt. No. 1 at 2, ¶1. The plaintiff noticed another incarcerated person walking towards him in an "aggressive posture with his fists balled up and shouting out to the plaintiff; 'you about to die motherfucker.'" Id. at ¶2. The plaintiff did not see any staff nearby, and the other incarcerated person continued to threaten him using racist language. Id. at ¶3. The plaintiff asserts that the other incarcerated person told him, "chink you in a U.S. prison now, and we get down." Id. at ¶4. The plaintiff took a defensive stance and struck at the other incarcerated person. Id. at ¶5. The plaintiff says "[m]utual combat commenced between" them, but he "did not cause any serious physical injuries" to the other incarcerated person. Id.

The plaintiff asserts that he and the other incarcerated person "had separated making no further contact with one another" before staff intervened.

Dkt. No. 57 at 3, ¶18. The plaintiff says he did not attempt to reengage or harm the other incarcerated person. Id. at ¶19. He asserts that the officers attacked him from behind while he "was in a defensive stance and not engaged with" the other incarcerated person. Id. at ¶20. He reiterates that one officer "struck [him] from behind and violently lodged [him] into the steel bars." Id. at ¶21. He says he "was then hit again by another person slamming their weight onto him." Id. The plaintiff says he later learned that O'Neill was the first officer who "violently launched him into the steel bars," and Barzyk was the second officer who "struck him with what can be described as a tackle pile up." Id. at ¶22. The plaintiff reiterates that he "never resisted any directive by staff." Id. at ¶24. He also maintains that while he was pinned against the bars, O'Neill said to him, "you slant-eyed fucker, we run this prison." Id. at ¶23. The defendants reiterate that they observed the plaintiff making what they believed were offensive strikes against the other incarcerated person, and they attempted to stop the fight by using physical force to restrain the plaintiff. Dkt. No. 59 at ¶¶18–20. They again assert that the plaintiff ignored their orders, resisted and attempted to break free from them. Id. at ¶¶21–22, 24. O'Neill again denies making the alleged statement to the plaintiff. Id. at ¶23.

The plaintiff contests O'Neill's reasons for not using pepper spray to stop the plaintiff and the other incarcerated person from fighting. He avers that correctional staff "always give a directive for inmates to stop fighting" and "always use highly effective pepper spray" on fighting incarcerated persons. Dkt. No. 57 at 1, ¶¶1–2. He says the pepper spray officers use comes out in a

straight line, not as an aerosol spray, which reduces the risk that bystanders will be exposed to the spray. Id. at ¶3–4. The plaintiff avers that correctional officers often use pepper spray "recklessly and without regard to other inmates who are not the target." Id. at ¶5. He says pepper spray incapacitates and disorients the target and renders them incapable of continuing a fight. Id. at ¶¶7–8. The plaintiff avers that O'Neill did not use pepper spray on the plaintiff because at the time he "was upon the plaintiff, the plaintiff was not engaged in any physical contact" with the other incarcerated person. Id. at ¶9. The defendants do not dispute that the pepper spray correctional officers use is incapacitating and disorienting, but they reiterate that O'Neill chose not to use pepper spray "because he was worried that it would potentially cause more damage than good." Dkt. No. 59 at ¶9 (citing Dkt. No. 43 at ¶15).

The plaintiff asserts that the other incarcerated person did not cause any of the injuries he suffered and for which he needed medical treatment on October 6, 2018. Dkt. No. 57 at ¶27. He also says that the other incarcerated person suffered no injuries. Id. at ¶28. The defendants maintain that it was "unclear" whether the plaintiff's injuries were suffered during his fight with the other incarcerated person or from staff intervening to stop the fight. Dkt. No. 59 at ¶27. They dispute that the other incarcerated person suffered no injuries. Id. at ¶28.

The plaintiff asserts that O'Neill fabricated his statement about the plaintiff resisting O'Neill's attempts to restrain him by pushing his body against the wall and trying to break free. Dkt. No. 57 at ¶31. The plaintiff cites a

summary of O'Neill's testimony from an October 24, 2018 disciplinary hearing held on disciplinary charges brought against the plaintiff after the October 6, 2018 incident. Id. at ¶32; Dkt. No. 57-1 at 6. During that hearing he asked O'Neill, "Why did you say [the plaintiff] was resisting?", and O'Neill responded that the plaintiff "didn't give [O'Neill] his hand when [he] directed [the plaintiff] to." Dkt. No. 57-1 at 6. The plaintiff also asked O'Neill, "Why was I ran [*sic*] into the SCH gate face first?" Id. O'Neill responded, "I put him to the ground, I never saw his face hit anything." Id. The plaintiff also questioned Spencer Potts, the other incarcerated person involved in the October 6, 2018 altercation. Id. He asked Potts whether he struck the plaintiff, whether he was "involved in the fight" and whether he caused the plaintiff's injuries. Id. Potts denied his involvement and denied striking the plaintiff or causing his injuries. Id. The plaintiff asserts that O'Neill violently assaulted him because the plaintiff "didn't give him his hand quick enough." Dkt. No. 57 at 4, ¶33. He says that O'Neill's "initial assault" on the plaintiff "occurred when he was standing and making sure he wasn't attacked a second time." Id. at ¶34. O'Neill maintains that the plaintiff resisted and attempted to break free while O'Neill was attempting to physically restrain him. Dkt. No. 59 at ¶¶31–33. The defendants reiterate that they "restrained Plaintiff while he was engaged in an altercation with another inmate" that they believed they needed to stop quickly. Id. at ¶34.[4]

---

[4] The plaintiff includes several proposed facts about security cameras at Waupun, and he asserts that Waupun has a chronic issue with camera footage of staff assaults on incarcerated persons being unavailable. Dkt. No. 57 at 2, ¶¶10–16. The plaintiff says he made an open records request for the footage

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. "Material facts" are those that "might affect the outcome of the suit." Id. Disputes about proposed facts "that are not outcome-determinative are not material and will not preclude summary judgment." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

---

from October 6, 2018, but the footage does not exist. Id. at ¶12. The plaintiff is not proceeding on a claim regarding spoliation of evidence, and he does not claim that the defendants intentionally destroyed evidence. His concern about the lack of video evidence is not relevant to whether the officers used excessive force on him on October 6, 2018, so the court will not consider these proposed facts in deciding the defendants' motion for summary judgment.

B.    Eighth Amendment Standard

The court analyzes the plaintiff's claim that the officers used excessive force against him under the Eighth Amendment, which protects an incarcerated person from cruel and unusual punishments. See generally Wilson v. Seiter, 501 U.S. 294 (1991). "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). An Eighth Amendment claim consists of an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of a claim of excessive force, the plaintiff must present evidence showing both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6 (citing Whitley, 475 U.S. at 320–21). The plaintiff alternatively can satisfy his burden by showing "that officials used force with 'a knowing willingness that [harm] occur.'" Farmer, 511 U.S. at 836 (quoting Hudson, 503 U.S. at 7).

The court must consider several factors in determining whether a use of force was necessary or excessive. Hudson, 503 U.S. at 7. These factors include "the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of

15

the injury caused by the force." <u>Lewis v. Downey</u>, 581 F.3d 467, 477 (7th Cir. 2009) (citing <u>Whitley</u>, 475 U.S. at 321, and <u>Fillmore v. Page</u>, 358 F.3d 496, 504 (7th Cir. 2004)).

C.    <u>Analysis</u>

It is undisputed that the plaintiff was involved in an altercation with another incarcerated person on October 6, 2018. It is undisputed that Officers O'Neill and Barzyk used physical force in an attempt to restrain the plaintiff and end the altercation. It is undisputed that the plaintiff suffered injuries on October 6, 2018, including a laceration above his left eye, a puncture wound above his lip and bruising on the left side of his face. The parties dispute the extent of the force the officers used to subdue the plaintiff, the need for that amount of force and whether the plaintiff resisted the officers' attempts to subdue him and intervene to stop the altercation.

The officers aver that they came upon the altercation and witnessed the plaintiff using offensive strikes to punch the other incarcerated person. O'Neill avers that he believed the plaintiff was seriously harming the other incarcerated person, so he needed to act quickly to stop the altercation. He avers that he yelled at the incarcerated persons to stop fighting, but the plaintiff ignored his commands and continued to strike the other incarcerated person. O'Neill believed using pepper spray could cause more harm than good and potentially harm bystanders, so he did not attempt to use pepper spray first before using force against the plaintiff. O'Neill says he used only the force necessary to subdue the plaintiff, a "medium sized" and agitated man. He avers

16

that the plaintiff continued to fight and ignore his orders and attempted to push away from him and continue fighting. O'Neill says he took the plaintiff to the ground carefully, using as little force as possible so he could pin him to the ground and handcuff him. He denies ramming the plaintiff into a gate, lodging his head in between steel bars or saying anything offensive to him. He says he would not have used force if the plaintiff had followed his command to stop fighting.

Barzyk avers that he also yelled at the plaintiff to stop fighting, but that the plaintiff disobeyed that command. He also says he believed the plaintiff was using offensive strikes against the other incarcerated person. Barzyk says he saw the plaintiff push his body against a wall in an attempt to break free from O'Neill and continue fighting. Barzyk says he decided against using pepper spray, but he also says he had to "put away" the spray before assisting O'Neill in restraining the plaintiff. Barzyk says he helped secure" the plaintiff, and he denies ramming the plaintiff's head into a gated door or lodging his head between bars of a door. Barzyk agrees with O'Neill's statement that the officers took the plaintiff to the ground softly and carefully, using as little force as possible. He denies hearing O'Neill say anything offensive to the plaintiff. He asserts that he did not intend to harm the plaintiff and used force only to "deescalate the situation" when the plaintiff ignored the officers' commands.

The plaintiff filed his own declaration in which he contests most of the officers' statements. The plaintiff asserts that he was using only defensive strikes against the other incarcerated person, who made threats while

approaching him. He denies ignoring the officers' commands and says the other incarcerated person was the aggressor ignoring the officers. He says O'Neill did not grab him but violently tackled him from behind with enough force to lift him off the ground and slam him into the steel bars of a nearby door, which caused the cut on his forehead. He denies resisting O'Neill's use of force and says the officers slammed him into the floor using their full bodyweight and pushed down on his neck. The plaintiff asserts that the level of force used was unnecessary because he was not defying orders and was only defending himself against the other incarcerated person. Yet he also cites statements from the other incarcerated person in which he denies being involved with the fight on October 6, 2018, or striking the plaintiff at all. The plaintiff faults the officers for not first using pepper spray to defuse the altercation and suggests O'Neill chose not to use his spray so he could instead use unnecessary force on the plaintiff. He asserts O'Neill lied about the plaintiff resisting and used force because the plaintiff did not give O'Neill his hand quick enough. He says O'Neill used racist language against the plaintiff while he was pinned against the door and told him that the officers run the prison.

Viewing the evidence in the light most favorable to the plaintiff, and considering the relevant factors from Seventh Circuit and Supreme Court law, the court finds that summary judgment is not appropriate. A reasonable jury hearing the evidence presented by both parties could believe the officers and conclude that their use of force was justified by their belief that the plaintiff was attacking another incarcerated person and denying their commands to

stop. A jury could believe that they used appropriate force to defuse or deescalate the situation "in a good-faith effort to maintain or restore discipline." Hudson, 503 U.S. at 6. A jury could conclude that the plaintiff's injuries, even if caused by the officers' use of force, were a justifiable consequence of the officers' reasonable actions and were not inflicted maliciously or sadistically. Id. A jury also could conclude that the officers reasonably attempted "to temper the severity of a forceful response," Whitley, 475 U.S. at 321, by ordering the plaintiff and the other prisoner to stop fighting before using force.

But a reasonable jury also could believe the plaintiff's account that he was in a defensive posture and that the fight had reached a standstill when the officers approached. A jury might conclude that the officers had no need to apply the amount of force used on the plaintiff and instead could have used lesser force despite any perceived threat to bystanders. A jury reasonably could agree with the plaintiff that the officers had an opportunity to use pepper spray instead of physical force in an effort "to temper the severity of the force." Lewis, 581 F.3d at 477. A jury reasonably could believe the plaintiff's testimony that the officers needlessly picked him up and slammed or rammed him into a steel door before taking him violently to the ground, which caused the bruising and cuts on his head and lip. Although the plaintiff does not have personal knowledge that the officers had ill intent when tackling him, a jury could believe his statement that O'Neill used racist language and told him that the officers run the prison. If the jury believed that evidence, it reasonably could infer that the officers knew their actions were unnecessary and that they used

significant force intentionally to cause harm or to send a message to the plaintiff. See McCottrell v. White, 933 F.3d 651, 657–59 (7th Cir. 2019) (explaining that circumstantial evidence presenting two competing, reasonable inferences "creates an issue for the jury").

The parties also dispute the severity of the plaintiff's injuries. The defendants contend that the plaintiff suffered "relatively minor injuries considering that he was in a serious fight with another inmate and had to be physically restrained." Dkt. No. 41 at 10. But it is undisputed that the plaintiff was hospitalized for his injuries, where a doctor sutured the plaintiff's forehead wound. The hospital doctor described the plaintiff's bleeding and pain as minimal. But the photos that the plaintiff filed from immediately after the incident show a deep, bleeding cut on his forehead and significant bleeding and bruising on the left side of his face. A reasonable jury viewing this evidence could conclude that the plaintiff's wounds were more than "relatively minor."

Each party has provided sufficient evidence to allow a reasonable jury to find in their favor. The court may not decide which of the competing versions of the facts is the correct one or which of the parties is more credible. Those decisions are for a jury to make. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704–05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." (quotation marks and internal citations omitted)). The court will deny the defendants' motion for summary judgment and schedule this case for trial.

### III. Qualified Immunity

The defendants contend that even if the court determines that they used excessive force in restraining the plaintiff, they are entitled to qualified immunity. Dkt. No. 41 at 11–13. They assert that it is not clearly established that their "actions in quickly responding to an inmate fight and using force to remove an inmate from the fight were unconstitutional." Id. at 13. They contend that clearly established law holds that excessive force occurs only if an official acts "'maliciously and sadistically for the very purpose of causing harm.'" Id. (quoting Whitley, 475 U.S. at 320). They assert that they did not act maliciously and sadistically, so they are entitled to qualified immunity. Id.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Figgs v. Dawson, 829 F.3d 895, 905 (7th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). Qualified immunity is an affirmative defense. To defeat the defendants' assertion of qualified immunity, the plaintiff must show that 1) the defendants violated his constitutional right and 2) the right at issue was clearly established at the time of the violation. Pearson, 555 U.S. at 232. If the plaintiff fails to satisfy either inquiry, then the defendants are entitled to qualified immunity. See Muhammad v. Pearson, 900 F.3d 898, 904 (7th Cir. 2018) (citing Gibbs v. Lomas, 755 F.3d 529, 537 (7th Cir. 2014)).

The defendants note that the plaintiff failed to present an argument in opposition to their assertion of qualified immunity. Dkt. No. 58 at 2. That is true; but it also is true that the plaintiff is an incarcerated person who is representing himself and likely has limited knowledge of the law. It is especially unlikely he is familiar with qualified immunity or the standard for granting the defendants immunity. The plaintiff filed his own proposed facts, a declaration and evidence in support of his opposition to the defendants' motion for summary judgment. The court will consider those materials in determining whether the defendants are entitled to qualified immunity.

The defendants improperly apply their qualified immunity analysis only to their own version of the facts. For purposes of qualified immunity, the court must view the evidence in the light most favorable to *the plaintiff* because he is the nonmoving party. See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019). As the court explained above, a reasonable jury could believe the plaintiff's evidence and conclude not only that the officers used more force than was necessary, but also that they did so without first using lesser means to temper the need for force and used force intentionally to cause the plaintiff harm. A jury also could believe the plaintiff's testimony about what O'Neill said to him after subduing him, which could suggest the officers acted not in good faith but with the intent of harming the plaintiff and sending a message.

Under clearly established law, correctional officers may use force to diffuse a "prison disturbance," such as a fight between incarcerated persons. Hudson, 503 U.S. at 6–7 (citing Whitley, 475 U.S. at 320–21). As the

defendants note, "clearly established law holds that excessive force occurs when someone acts 'maliciously and sadistically for the very purpose of causing harm.'" Dkt. No. 41 at 13 (quoting <u>Whitley</u>, 475 U.S. at 320). But it is also clearly established that the plaintiff can show the officers used excessive force if he presents evidence that would allow a reasonable jury to conclude "that officials used force with a knowing willingness that harm occur." <u>McCottrell</u>, 933 F.3d at 665 (citing <u>Farmer</u>, 511 U.S. at 835–36, and <u>Whitley</u>, 475 U.S. at 321). It would not be reasonable for the officers to use the amount of force the plaintiff avers that they used on him when he was in a defensive stance and (according to his declaration) did not active resist or defy their orders. <u>See</u> <u>Abbott v. Sangamon Cty., Ill.</u>, 705 F.3d 706, 732 (7th Cir. 2013) (citing <u>Morfin v. City of E. Chi.</u>, 349 F.3d 989, 1005 (7th Cir. 2003)). A reasonable jury could accept the plaintiff's version of the facts and conclude that the officers instead used the force they did either "for the very purpose of causing harm" or "with a knowing willingness that harm occur" when they tackled and subdued him on October 6, 2018.

The officers are not entitled to qualified immunity.

## IV. Defendants' Motion to Seal Document (Dkt. No. 49)

The defendants have asked the court to seal[5] one of the documents filed in support of their motion for summary judgment. Dkt. No. 49. That document

---

[5] "Sealing" a document means that it is available only to the court. "Restricting" a document means that it is restricted to view only by any identified parties. The court construes the defendants' motion as a motion to "restrict" the document.

is an unredacted copy of DAI Policy 306.07.01, which governs the Use of Force by officers in DOC institutions. Dkt. No. 47. The defendants assert that the document contains "confidential [DOC] policies that contain information relating to the management of institutions and use of force by staff against inmates that would generally not be available to the public." Dkt. No. 49 at 1. They contend that public release of the document "will compromise safety and security of institutions within the [DOC]." Id. The plaintiff did not respond to the motion.

A party requesting to file documents as restricted or under seal must show good cause for such restriction and file a redacted version for public viewing, if possible. See General Local Rule 79(d)(1), (3) (E.D. Wis.). But "[t]he strong presumption of public disclosure applies only to the materials that formed the basis of the parties' dispute and the district court's resolution." Baxter Int'l, Inc. v. Abbott Labs., 297 F.3d 544, 548 (7th Cir. 2002); see also City of Greenville, Ill. v. Syngenta Crop Prot., LLC, 764 F.3d 695, 698 (7th Cir. 2014).

Neither party relies heavily on DAI Policy 306.07.01. In fact, the only citation to the policy (aside from the redacted version of the policy attached to a declaration, dkt. no. 46 and 46-3) is in one paragraph of Officer Barzyk's declaration defining force: "Force is used to exercise strength or power to overcome resistance or to compel another to act or to refrain from acting in a particular way. *Please see Exhibit 1002,* for the DAI Policy No. 306. 07.01, Use of Force." Dkt. No. 44 at ¶18. The policy itself is not relevant to the court's

determination that there are disputes of material fact precluding judgment as a matter of law. Moreover, a violation of prison or departmental policy alone does not establish a constitutional violation, see Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017); Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003)); and the plaintiff is not proceeding on a state law claim related to a potential violation of that policy.

The court finds that the defendants have satisfied their burden to show good cause to restrict public access to DAI Policy 306.07.01, and the defendants have filed a redacted version for public use. Dkt. No. 46-3. The court will grant their motion and will restrict DAI Policy 306.07.01 to viewing by the court and parties only.

## V. Conclusion

The court **DENIES** the defendants' motion for summary judgment. Dkt. No. 40.

The court **GRANTS** the defendants' motion to restrict document. Dkt. No. 49. The court **ORDERS** that Dkt. No. 47 is **RESTRICTED** to viewing by the court and the parties only until further order of the court.

The court will enter a separate order scheduling a status conference with the parties to determine the next steps in this case.

Dated in Milwaukee, Wisconsin this 6th day of July, 2023.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**United States District Judge**